**Case No. 23-3138**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

JOHN DOE,

*Plaintiff-Appellee*,

v.

SSM HEALTH CARE
CORPORATION,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Eastern District of Missouri,
Case No. 23-cv-00022, the Honorable Stephen R. Clark

---

# BRIEF OF APPELLANT

---


PAUL G. KARLSGODT
**BAKER & HOSTETLER LLP**
1801 California Street, Suite 4400
Denver, Colorado 80202
303.861.0600
pkarlsgodt@bakerlaw.com

DAVID A. CARNEY
**BAKER & HOSTETLER LLP**
127 Public Square, Suite 2000
Cleveland, Ohio 44114
216.621.0200
dcarney@bakerlaw.com

JOHN D. COMERFORD
ADAM J. SIMON
**DOWD BENNETT LLP**
7676 Forsyth Blvd., Suite 1900
St. Louis, Missouri 63105
314.889.7311
jcomerford@dowdbennett.com
asimon@downbennett.com

*Attorneys for Defendant-Appellant*
*SSM Health Care Corporation*

# SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Scores of website privacy cases like this one have been filed against healthcare providers located throughout the nation over the course of the past year. Part of this case, just like part of the *Doe I, et al. v. BJC Healthcare System* case that is currently pending before this Court, *see* Case No. 23-1107 (argued Sept. 20, 2023), challenges alleged privacy violations under Missouri state law precisely when an individual clicks on SSM Health's MyChart patient portal link. The federal government wanted individuals to be able to access their healthcare information online, however, and took substantial actions took make sure this online access happened. SSM Health heeded this call for federal assistance, and this protective clash between federal and state interests makes federal jurisdiction appropriate in this case.

This appeal here also raises a second issue: whether federal jurisdiction is also appropriate under the Class Action Fairness Act (CAFA), where plaintiff John Doe pleaded himself into minimal diversity by failing to limit his putative class to current Missouri citizens, and instead defined the class as follows: "*During the fullest period allowed by law*, all Missouri citizens, who are, *or were*, SSM Health patients."

This case belongs in federal court because the statutory requirements for federal jurisdiction are met. The district court erred in holding otherwise. SSM Health respectfully submits that oral argument will assist the Court in analyzing the issues presented by this appeal, limited to twenty minutes per side.

## CORPORATE DISCLOSURE STATEMENT

SSM Health certifies that SSM Health Care Corporation does not have a parent company or corporation and that no publicly held corporation owns 10% or more of SSM Health Care Corporation's stock.

## TABLE OF CONTENTS

**Page**

**SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT......i**

**CORPORATE DISCLOSURE STATEMENT.................................................. ii**

**TABLE OF AUTHORITIES ........................................................................vi**

**JURISDICTIONAL STATEMENT.......................................................................1**

**STATEMENT OF ISSUES ...............................................................................2**

**STATEMENT OF THE CASE............................................................................3**

A. DOE'S MISSOURI STATE LAW PETITION ALLEGES WEBSITE PRIVACY VIOLATIONS AGAINST SSM HEALTH. ....................................3

B. DOE'S ALLEGATIONS IN HIS PETITION AGAINST SSM HEALTH ARE NOT NOVEL OR NEW. ......................................................................4

C. SSM HEALTH REMOVED DOE'S PETITION TO FEDERAL COURT ON TWO SEPARATE GROUNDS. ...................................................................6

*1. Doe's allegations related to the SSM Health MyChart patient portal make federal officer removal appropriate...........6*

*2. Doe's Missouri Wiretap Act claim specifically alleges a violation when an individual clicks on the patient portal link.........................................................................................8*

*3. Doe's durational class definition of the term "citizens" makes Class Action Fairness Act removal appropriate. ..........10*

D. THE DISTRICT COURT REMANDS THE CASE, SUA SPONTE RAISING ARGUMENTS AGAINST CLASS ACTION FAIRNESS ACT REMOVAL. .......11

**SUMMARY OF ARGUMENT.........................................................................13**

**ARGUMENT..................................................................................................14**

A. STANDARD OF REVIEW. ...................................................................14

B. FEDERAL JURISDICTION OVER DOE'S PETITION IS PROPER UNDER THE CLASS ACTION FAIRNESS ACT. .....14

1. *CAFA reflects Congress's strong desire that interstate class actions be heard in federal court.* .....*14*

2. *A plaintiff can plead himself into or out of federal court under CAFA.* .....*16*

3. *The district court erred in interpreting Doe's putative class definition to include only "current" Missouri citizens.* .....*17*

4. *When read in context the "during the fullest period allowed by law" should modify the phrase "all Missouri citizens."* .....*19*

5. *The Court should read any ambiguity against Doe, as the drafter of the putative class definition provision.* .....*20*

6. *The home state and local controversy exceptions to CAFA jurisdiction do not apply.* .....*23*

C. FEDERAL OFFICER REMOVAL RESTS ON THE BASIC INTEREST OF THE ENFORCEMENT OF FEDERAL LAW THROUGH FEDERAL OFFICIALS.....25

D. SSM ACTED UNDER COLOR OF FEDERAL LAW IN MAKING A PATIENT PORTAL AVAILABLE ONLINE UNDER WATSON. .....26

1. *The Supreme Court interprets the "acting under" requirement for federal officer removal in Watson.* .....*27*

2. *The acting under requirement is met in this case based on Doe's patient portal allegations.* .....*29*

E. THE DISTRICT COURT'S ACTING UNDER ANALYSIS FOR THE FACTS ALLEGED IN DOE'S PETITION IS FLAWED. .....34

F. DOE'S MISSOURI STATE LAW CLAIMS ARE "FOR" OR "RELATED TO" SSM HEALTH'S ACTIONS TAKEN UNDER COLOR OF FEDERAL LAW. ...37

G. SSM HEALTH HAS COLORABLE FEDERAL DEFENSES TO DOE'S MISSOURI STATE LAW CLAIMS. .....40

1. *Doe's allegations regarding alleged HIPAA violations provide for federal jurisdiction on their own.* ..........................*41*

2. *SSM Health also has federal preemption and First Amendment defenses to Doe's Missouri state law claims.* .......*43*

**CONCLUSION**......................................................................................**47**

**CERTIFICATE OF COMPLIANCE** ...................................................................**49**

**VIRUS CHECK CERTIFICATION**......................................................................**50**

**CERTIFICATE OF SERVICE** ..........................................................................**51**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson, Trustee of the Diane L. Anderson Revocable Trust v. Davis Wright Tremaine LLP*,
2021 WL 7184127 (D. Or. July 14, 2021) ....................................................21

*Baker v. Atlantic Richfield Co.*,
962 F.3d 937 (7th Cir. 2020) ....................................................40

*Boggs v. Boggs*,
520 U.S. 833 (1997)....................................................44

*BP P.L.C. v. Mayor & City Council of Baltimore*,
141 S. Ct. 1532 (2021)....................................................1

*Brunts v. Walmart, Inc.*,
68 F.4th 1091 (8th Cir. 2023) ....................................................23

*Buljic v. Tyson Foods, Inc.*,
22 F.4th 730 (8th Cir. 2021) ....................................................14, 26

*Cary v. Curtis*,
3 How. 236, 11 L.Ed. 576 (1845) ....................................................12, 47

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*,
790 F.3d 457 (3d Cir. 2015) ....................................................43

*Dart Cherokee Basin Operating Co., LLC v. Owens*,
574 U.S. 81 (2014)....................................................15

*DeFiore v. SOC LLC*,
--- F.4th ----, 2023 WL 7009600 (9th Cir. Oct. 25, 2023)....................................................37

*Doe v. BJC Health System*,
2023 WL 369427 (E.D. Mo. Jan. 10, 2023) ....................................................11, 13, 34

*Doe v. ProMedica Health Sys., Inc.*,
2020 WL 7705627 (N.D. Ohio Oct. 30, 2020)............................................34, 45

*Doe v. UPMC*,
2020 WL 4381675 (W.D. Pa. Jul.31, 2020) ................................................34, 45

*English v. General Elec. Co.*,
496 U.S. 72 (1990)........................................................................................43, 44

*Evans v. Walter Indus.*,
449 F.3d 1159 (11th Cir. 2006) .......................................................................23

*Graves v. 3M Co.*,
17 F.4th 764 (8th Cir. 2021) ......................................................................14, 40

*Greenlaw v. United States*,
554 U.S. 237 (2008)...........................................................................................21

*Hargett v. RevClaims, LLC*,
854 F.3d 962 (8th Cir. 2017) ...............................................................3, 14, 16, 23

*Hargis v. Access Cap. Funding, LLC*,
674 F.3d 783 (8th Cir. 2012) ...........................................................................20

*Hood v. Glister-Mary Lee Corp.*,
785 F.3d 263 (8th Cir. 2015) ...........................................................................16

*Isaacson v. Dow Chem. Co.*,
517 F.3d 129 (2d Cir. 2008) ............................................................................37

*Jacks v. Meridian Resource Co., LLC*,
701 F.3d 1224 (8th Cir. 2012) ....................................................................2, 36, 37

*Jeff D. v. Andrus*,
899 F.2d 753 (9th Cir. 1989) ...........................................................................18

*Jefferson Cty., Ala. v. Acker*,
527 U.S. 423 (1999).....................................................................................40, 41

*Johnson Controls, Inc. v. City of Cedar Rapids, Iowa*,
713 F.2d 370 (8th Cir. 1983) ...........................................................................22

*Johnson v. Advance Am.*,
549 F.3d 932 (4th Cir. 2008) ....................................................................16

*King v. St. Vincent's Hosp.*,
502 U.S. 215 (1991)....................................................................................18

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020) ..............................................................25, 37

*Leflar v. Target Corp.*,
57 F.4th 600 (8th Cir. 2023) ...............................................................3, 14, 15, 23

*Lockerty v. Phillips*,
319 U.S. 182 (1943)..............................................................................12, 47

*Maryland v. Soper*,
270 U.S. 9 (1926)........................................................................................37

*Mesa v. California*,
489 U.S. 121 (1989)..............................................................................25, 41

*Minnesota by Ellison v. Am. Petrol. Inst.*,
63 F.4th 703 (8th Cir. 2023) ................................................................26, 38

*Murphy v. Nat'l Coll. Ath. Ass'n*,
584 U.S. ---, 138 S. Ct. 1461 (2018)..........................................................43

*NLRB v. Federbush Co.*,
121 F.2d 954 (2d Cir. 1941) .....................................................................18

*Packingham v. North Carolina*,
137 S.Ct. 1730 (2017)...................................................................................45

*Raskas v. Johnson & Johnson*,
719 F.3d 884 (8th Cir. 2013) .......................................................................24

*Reno v. American Civil Liberties Union*,
521 U.S. 844 (1997)......................................................................................45

*Robinson v. Shell Oil Company*,
519 U.S. 337 (1997)..............................................................................17, 18

*Shell Oil Co. v. Iowa Dep't of Revenue*,
488 U.S. 19 (1988)....................................................................................18

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017)..................................................................5

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018).....................................................................6, 42

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)....................................................................................46

*In re Sprint Nextel Corp.*,
593 F.3d 669 (7th Cir. 2010) ......................................................................15

*Stephenson v. Nassif*,
160 F. Supp. 3d 884 (E.D. Va. 2015) ..........................................................37

*Tennessee v. Davis*,
100 U.S. 257 (1879)....................................................................................25

*Travelers Indem. Co. v. Mitchell*,
925 F.3d 236 (5th Cir. 2019) ......................................................................19

*U.S. West, Inc. v. F.C.C.*,
182 F.3d 1224 (10th Cir. 1999) ..................................................................47

*United States v. Jespen*,
944 F.3d 1019 (8th Cir. 2019) ....................................................................18

*United States v. Sineneng-Smith*,
590 U.S. ----, 140 S. Ct. 1575 (2020) ..........................................................21

*United States v. Todd*,
245 F.3d 691 (8th Cir. 2001) ..................................................................40, 43

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007)...............................................................................*passim*

*Westerfeld v. Indep. Processing, LLC*,
621 F.3d 819 (8th Cir. 2010) ..............................................................14, 23, 25

*Willingham v. Morgan*,
395 U.S. 402 (1969) ........ 2, 25, 39, 40

**Statutes, Regulations & Other Authorities**

42 C.F.R. § 495.20 ........ 44

45 C.F.R. § 164.508 ........ 41, 42

45 C.F.R. § 164.514 ........ 41

28 U.S.C. 1442 ........ *passim*

28 U.S.C. § 1291 ........ 1

28 U.S.C. § 1332 ........ *passim*

28 U.S.C. § 1447 ........ 1

42 U.S.C. § 300jj-11 ........ 29, 30

42 U.S.C. § 1395w-4 ........ 31

Mo. Rev. Stat. § 542.402 ........ 8

Mo. Rev. Stat. § 569.095 ........ 9

Douglas J. Lieth, *Web Browser Privacy: What Do Browsers Say When They Phone Home?* ........ 39

Fed. Trade Comm'n, *A Look at What ISPs Know About You: Examining the Privacy Practices of Six Major Internet Service Providers* ........ 39

Office of the National Coordinator, *A 10- Year Vision to Achieve an Interoperable Health IT Infrastructure* ........ 35

## JURISDICTIONAL STATEMENT

Plaintiff John Doe filed his petition against SSM Health in the St. Louis Circuit Court on December 5, 2022. (App. 25-103; R. Doc. 1-1, at 1-79.) Doe served SSM Health with a copy of the petition on December 7, 2022. (App. 103; R. Doc. 1-3.) SSM Health removed the petition to the United States District Court for the Eastern District of Missouri on January 6, 2023, under both 28 U.S.C. § 1442(a)(1) and 28 U.S.C. § 1332(d). (App. 7-24; R. Doc. 1, at 1-18.)

The district court granted Doe's motion to remand the case to the St. Louis Circuit Court on August 22, 2023. (App. 402-419; R. Doc. 28, at 1-18.) SSM Health timely filed its notice of appeal from the district court's remand order on September 20, 2023. (App. 420; R. Doc. 33, at 1.) This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 and 28 U.S.C. § 1447(d), which expressly permit review of remand orders for cases removed pursuant to 28 U.S.C. § 1442.

This jurisdiction extends to review of the district court's remand order under the Class Action Fairness Act. *See BP P.L.C. v. Mayor & City Council of Baltimore*, 539 U.S. ----, 141 S. Ct. 1532, 1538 (2021) (holding "§ 1447(d) permits appellate review of the district court's remand order—without any further qualification").

## STATEMENT OF ISSUES

This appeal presents two issues for the Court's review:

*First*, whether SSM Health properly removed this case to federal court under 28 U.S.C. § 1442(a)(1) based on Doe's allegations that SSM Health violated his and other putative class members' privacy rights under Missouri state law by allegedly disclosing internet metadata to Facebook at the moment they clicked on SSM Health's MyChart patient portal link.

The most apposite authorities for this issue are:

- 28 U.S.C. § 1442(a)(1)
- *Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007)
- *Willingham v. Morgan*, 395 U.S. 402 (1969)
- *Jacks v. Meridian Resource Co., LLC*, 701 F.3d 1224 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C.*, 141 S. Ct. at 1536.

*Second*, whether SSM Health properly removed this case to federal court under the Class Action Fairness Act based on minimal diversity, where Doe failed to limit his putative class to include only current Missouri citizens, but instead broadly defined the class to include "*during the fullest period allowed by law*, all Missouri citizens who are, *or were*, SSM Health patients of SSM Health Care Corporation, or any of its affiliates" (App. 61-62; R. Doc. 1-1, at 37-38, ¶ 150).

The most apposite authorities for this issue are:

- 28 U.S.C. § 1332(d)(2)
- *Leflar v. Target Corp.*, 57 F.4th 600 (8th Cir. 2023)
- *Hargett v. RevClaims, LLC*, 854 F.3d 962 (8th Cir. 2017)
- *Dart Cherokee Basin Oper. Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).

## STATEMENT OF THE CASE

### A. DOE'S MISSOURI STATE LAW PETITION ALLEGES WEBSITE PRIVACY VIOLATIONS AGAINST SSM HEALTH.

This is a website privacy case. Doe alleges that "[a]t all relevant times," SSM Health allegedly "disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospital they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent." (App. 26; R. Doc. 1-1, at 2, ¶ 3.)

These alleged disclosures do not occur through the disclosure of actual, confidential medical records. Instead, they occur through the alleged transmission of internet metadata. Specifically, Doe alleges SSM Health "intentionally deploys source code on the websites it operates, including https://www.ssmhealth.com, that cause patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties." (App. 29; R. Doc. 1-1, at 5, ¶ 19.) Doe refers to this alleged source code in his petition as the "Meta Pixel." (App. 36; R. Doc. 1-1, at 12, ¶¶ 50-51.)

Doe alleges this "personally identifiable information" includes the following:

(1) Internet protocol (IP) addresses, which Doe alleges is "a number that identifies a computer connected to the internet" (App. 32; R. Doc. 1-1, at 8, ¶ 31);

(2) internet "cookies," which Doe alleges are "small text files that web servers can place on a user's browser and computer a user's browser interacts with a website server" (App. 32; R. Doc. 1-1, at 8, ¶ 33);

(3) "browser-fingerprints," which Doe alleges are "information collected about a computing device that can be used to identify the specific device" (App. 33; R. Doc. 1-1, at 9, ¶ 36); and, finally,

(4) "unique user identifiers," such as "Facebook's 'Facebook ID')"; Doe alleges this latter unique identifier is "an identifying number string that is connected to a user's Facebook activity" (App. 33-34; R. Doc. 1-1, at 9-10, ¶ 40).

### B. DOE'S ALLEGATIONS IN HIS PETITION AGAINST SSM HEALTH ARE NOT NOVEL OR NEW.

The above-stated allegations in this case against SSM Health are neither novel nor unique. The case is part of a wave of website privacy litigation that has been filed against healthcare providers throughout the nation over the alleged use of analytical tools on their websites. *See, e.g., Doe v. Heritage Valley Health System, Inc.*, W.D. Pa., No. 2:23-cv-01044; *Doe v. UMass Memorial Healthcare, Inc.*, D. Mass., No. 4:22-cv-12022; *Doe v. Hoag Memorial Hospital Presbyterian*, C.D. Cal, No. 8:23-cv-00444; *Doe v. Torrance Memorial Medical Center*, C.D. Cal.,

No. 2:23-cv-01237; *Doe v. University of Maryland Medical System Co.*, D. Md., No. 1:23-cv-00690; *Horton v. Willis-Knighton Medical Center*, W.D. La., No. 1:23-cv-00314; *Doe v. Scranton Quincy Hospital Company LLC*, M.D. Pa., No. 3:23-cv-00318; *Doe et al. v. Mosaic Health System*, W.D. Mo., No. 5:23-cv-06008; *Doe v. Atrius Health, Inc.*, D. Mass., No. 1:22-cv-12196; *Doe v. St. Agnes Medical Center*, E.D. Ca., No. 1:23-cv-00705; *Doe I et al. v. Excela Health Et al.*, W.D. Pa., No. 2:23-cv-00833; *Doe v. Cape Cod Healthcare, Inc.*, D. Mass., No. 1:23-cv-10080; *Doe v. Capital Health Systems, Inc.*, D.N.J., No. 3:23-cv-01247; *Simon v. NewYork-Presbyterian Healthcare System Inc., et al.*, S.D.N.Y., No. 1:23-cv-03428; *Kane, et al. v. University of Rochester*, W.D.N.Y, No. 6:23-cv-06327-FPG.

These cases also are not new. More than five years ago, the Ninth Circuit affirmed the dismissal of an analogous website privacy complaint against Facebook and seven healthcare defendants for allegedly making and receiving these same types of alleged internet metadata disclosures. *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 948 (N.D. Cal. 2017) (detailing allegations regarding "**How Facebook Tracks Visitors' Web Browsing Activity**") (emphasis in original); *see also id.* at 954-55, n. 4-7 (collecting alleged healthcare website "URLs," including http://my.clevelandclinic.org/search/results?q=intestine%20transplant).

In doing so, the appellate court stated as follows: "We do not agree that the collected data is so different or sensitive. The data show only that Plaintiffs searched

and viewed publicly available health information that cannot, in and of itself, reveal details of an individual's health status or medical history. Moreover, many other kinds of information are equally sensitive." *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018).

The appellate court concluded: "Information available on publicly accessible websites stands in stark contrast to the personally identifiable patient records and medical histories protected by these statutes—information that unequivocally provides a window into an individual's personal medical history." *Id.*

### C. SSM Health Removed Doe's Petition to Federal Court on Two Separate Grounds.

SSM Health removed this particular website privacy case to federal court on two grounds. *First,* under 28 U.S.C. § 1442(a)(1), the federal officer removal statute. (App. 9-17; R. Doc. 1, at 3-11, ¶¶ 10-38.) *Second,* under 28 U.S.C. § 1332(d), the Class Action Fairness Act. (App. 17-22; R. Doc. 1, at 11-16, ¶¶ 39-58.)

#### *1. Doe's allegations related to the SSM Health MyChart patient portal make federal officer removal appropriate.*

SSM Health first removed this case to federal court under the federal officer removal statute. SSM Health removed on this basis because Doe's petition seeks to hold SSM Health liable under Missouri state law for actions taken under color of federal law: providing individuals with access to their healthcare information online. (App. 7-12; R. Doc. 1, at 1-6, ¶¶ 4-5, 12, 20-22.)

As detailed in the argument below, this federal action began with an Executive Order from President George W. Bush in April 2004, ordering the Secretary of the Department of Health and Human Services to "establish within the Office of the Secretary the position of National Health Information Technology Coordinator." (*See Executive Order # 13335*, at pg. 1, § 1 (*Establishment*).) Congress then followed suit in 2009, through the Health Information Technology for Economic and Clinical Health Act (HITECH Act), which statute then codified the Office of the National Coordinator for Health Information Technology. *See* 42 U.S.C. § 300jj-11(a).

And, from the outset of this federal health information technology initiative, providing individuals with access to their healthcare information online through the Medicare and Medicaid programs became a federal governmental priority. As the National Coordinator explained in his first official strategic plan: "The single biggest lever to individual empowerment is access to data." (App. 156; R. Doc. 19-2, at pg. 36.) Thus also: "The Federal Health IT Taskforce has recognized individual access to data as a primary objective." (App. 160; R. Doc. 19-2, at pg. 40.)

SSM Health met this requirement through the "SSM Health MyChart patient portal." (App. 7; R. Doc. 1, at 1, ¶ 4.) This patient portal is available to individuals through the following link: https://www.ssmhealth.com/mychart. (*Id.*) Nearly every page of SSM Health's publicly available website, https://ssmhealth.com, links directly to this SSM Health MyChart patient portal page. (*Id.*)

An image of the internet page that comes up when an individual clicks on one of these MyChart patient portal links is set forth below:




(R. Doc. 19, at 2; *see also* https://ssmhealth.com/mychart (same).)

*2. Doe's Missouri Wiretap Act claim specifically alleges a violation when an individual clicks on the patient portal link.*

Doe's petition places alleged privacy violations relating to this SSM health MyChart patient portal link directly at issue in the case. In Count I of the petition, for example, Doe alleges that SSM Health "violated the Missouri Wiretap Act by intercepting Plaintiff's and Class Members' wire communications in violation of Mo. Rev. Stat. § 542.402(1)." (App. 69; R. Doc. 1-1, at 45, ¶ 175; *see also* Mo. Rev. Stat. § 542.402.1 ("a person is guilty of a class E felony and upon conviction shall be punished as provided by law," if such person: "(1) [k]nowingly intercepts,

endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire communication”).)

Doe does not limit this Missouri Wiretap Act claim to any particular links on SSM Health’s public website. To the contrary, Doe claims that “[*a*]*ll* alleged communications between Plaintiff or Class Members and Defendant qualify as wire communications under Missouri law,” allegedly because “each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.” (App. 69; R. Doc. 1-1, at 45, ¶ 179 (emphasis added).)

Moreover, to meet the statute’s communication “contents” requirement, Doe makes specific allegations directed toward the patient portal link. These include (1) that “Defendant aided in the interception of ‘contents’ in at least the following forms: . . . i. The precise text of specific buttons on Defendant’s website(s) that patients click to exchange communications, including *Log-Ins*, Registrations, Requests for Appointments, Search, and other buttons” (App. 71; R. Doc. 1-1, at 47, ¶ 185(i)), and (2) “[t]he precise dates and times when patients click to *Log-In* on Defendant’s websites,” (App. 71; R. Doc. 1-1, at 47, ¶ 185(j) (emphases added).)

This same analysis applies for Doe’s Tampering with Computer Data count. (App. 73-76; R. Doc. 1, at 49-52, ¶¶ 192-214.) For this claim, Doe alleges that under

Missouri state law "[a] person commits the offense of tampering with computer data if he or she knowingly and without authorization or without reasonable grounds to believe that he or she has such authorization discloses data 'residing or existing internal or external to a computer, computer system, or computer network.'" (App. 73; R. Doc. 1-1, at 49, ¶ 194 (quoting Mo. Rev. Stat. § 569.095).)

And, as with his Missouri Wiretap Act claim, the alleged information at issue directly challenges privacy violations for the patient portal link: "the exact contents of communications exchanged between Plaintiff and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, *and logins to Defendant's website*." (App. 74; R. Doc. 1-1, at 50, ¶ 201 (emphasis added).)

*3. Doe's durational class definition of the term "citizens" makes Class Action Fairness Act removal appropriate.*

Doe seeks to represent a putative class in pursuing these Missouri state law claims. (App. 61-62; R. Doc. 1-1, at 37-38, ¶ 150.) The issue for SSM Health's Class Action Fairness Act removal, and now before this Court on appeal, is this: *time*.

Immediately before his putative class definition, Doe alleges that "[t]he applicable statutes of limitations have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein." (App. 60; R. Doc. 1-1, at 36, ¶ 141.) Doe alleges that "Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendant's conduct, because there were

no disclosures or other indications that they were interacting with websites employing Meta Pixel." (App. 61; R. Doc. 1-1, at 37, ¶ 143.)

For these reasons, Doe further alleges "[a]ll applicable statute of limitations have also been tolled by operation of the discovery rule and the doctrine of continuing tort" (App. 61; R. Doc. 1-1, at 37, ¶ 145), and that "Defendant is therefore estopped from relying on any statute of limitations defense" (*id.*).

Immediately following these temporal allegations, Doe then seeks to represent the following putative class: "*During the fullest period allowed by law*, all Missouri citizens [1] who are, *or were*, patients of SSM Health Care Corporation, or any of its affiliates and [2] who exchanged communications at Defendant's websites, including www.ssmhealth.com and any other SSM Health Care Corporation affiliated website that [3] caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook." (App. 61-62; R. Doc. 1-1, at 37-38, ¶ 150 (emphasis added).)

### D. THE DISTRICT COURT REMANDS THE CASE, *SUA SPONTE* RAISING ARGUMENTS AGAINST CLASS ACTION FAIRNESS ACT REMOVAL.

Doe filed a motion to remand the case back to the City of St. Louis Circuit Court on February 3, 2023. (R. Doc. 13.) The district court granted this motion, rejecting both SSM Health's federal officer removal and Class Action Fairness Act arguments in the order. (App. 402-20; R. Doc. 28, at 1-18.)

The district court predominantly relied on the decision in *Doe v. BJC Health System,* 2023 WL 369427 (E.D. Mo. Jan. 10, 2023), in rejecting SSM Health's arguments for federal officer removal. (App. 407-09; R. Doc. 28, at 6-8.) The district court stated: "This Court agrees with the analysis in *BJC Health*. Offering incentives, rather than threatening civil or criminal penalties, adds nothing to the closeness of a private party's relationship with the government." (App. 409; R. Doc. 28, at 8.) This decision from the *BJC Healthcare System* case is now on appeal before this Court. (*See John Doe I, et al. v. BJC Healthcare System*, Case No. 23-1107.)

For CAFA, the district court acknowledged that "the language of this class definition is less than crystal clear" (App. 415; R. Doc. 28, at 14). The district court nonetheless interpreted this ambiguity against SSM Health, who did not draft the provision, and against federal jurisdiction, notwithstanding that there is no anti-removal presumption for CAFA cases. (App. 415-19; R. Doc. 28, at 14-18.)

Specifically, the district court concluded that Doe's proposed class definition should be interpreted to mean only "current" Missouri citizens, even though Doe did not include the word "current" in the definition, and even though Doe started the proposed definition with a temporal clause that would suggest the opposite interpretation from this one: "during the fullest period allowed by law." (App. 417-19; R. Doc. 28, at 16-18.)

This appeal followed. (App. 420; R. Doc. 33, at 1.)

## SUMMARY OF ARGUMENT

"All federal courts, other than the Supreme Court, derive their jurisdiction wholly from the exercise of the authority to 'ordain and establish' inferior courts, conferred on Congress by Article III, § 1 of the Constitution." *Lockerty v. Phillips*, 319 U.S. 182, 187 (1943). "The Congressional power to ordain and establish inferior courts includes the power 'of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good.'" *Id.* (quoting *Cary v. Curtis*, 3 How. 236, 245, 11 L.Ed. 576 (1845)).

This case belongs in federal court pursuant to two federal statutes: 28 U.S.C. § 1442(a)(1) and 28 U.S.C. § 1332(d)(2). To start with federal officer removal, SSM Health agrees with the district court that the *BJC* case, presently pending before this Court, involves similar issues under 28 U.S.C. § 1442(a)(1). (App. 407-09; R. Doc. 28, at 6-8.) The basis for removal in both cases is that the federal government wanted individuals to have the ability to access their health care records online; took substantial efforts to make sure this happened; and the defendants are now being sued for alleged privacy violations that occur the moment an individual clicks on that patient portal link, in direct contravention of this federal policy. While times have changed, this clash between federal and state interests places this case squarely within the statutory text, history and purposes for federal officer removal.

This case also belongs in federal court under the Class Action Fairness Act (CAFA). The sole issue for the Court on this CAFA question is how to interpret, textually, Doe's proposed class definition, and in particular its threshold qualifier "during the fullest period allowed by law." The district court acknowledged the ambiguity with Doe's proposed class, but nonetheless interpreted this ambiguity against SSM Health, and against federal jurisdiction. There is no presumption against federal jurisdiction and in favor of remand under CAFA, however. The district court's decision should thus be reversed for this reason as well.

## ARGUMENT

### A. STANDARD OF REVIEW.

"We review the district court's determination that it lacked federal jurisdiction *de novo*." *Graves v. 3M Co.*, 17 F.4th 764, 768 (8th Cir. 2021); *see also Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021) (same).

### B. FEDERAL JURISDICTION OVER DOE'S PETITION IS PROPER UNDER THE CLASS ACTION FAIRNESS ACT.

SSM Health begins its argument with the Class Action Fairness Act question because it most simply resolves this appeal.

#### 1. *CAFA reflects Congress's strong desire that interstate class actions be heard in federal court.*

"Because of perceived 'abuses of the class action device,' Congress enacted CAFA to provide, *inter alia*, for 'Federal court consideration of interstate cases of national importance.'" *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 822 (8th

Cir. 2010) (quoting Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2, 119 Stat. 4).

"Accordingly, CAFA grants broad federal jurisdiction over class actions and establishes narrow exceptions to such jurisdiction." *Id.*; *see also Leflar v. Target Corp.*, 57 F.4th 600, 603 (8th Cir. 2023) ("There is no question that the Class Action Fairness Act opened federal courts to more class-action lawsuits."); *Hargett v. RevClaims, LLC*, 854 F.3d 962, 965 (8th Cir. 2017) ("CAFA reflects Congress's desire for broad diversity jurisdiction over class actions.").

Specifically, "CAFA expands federal diversity jurisdiction to include class actions in which more than $5 million is in controversy if 'any member of a class of plaintiffs is a citizen of a State different than any defendant.'" *Id.* (quoting 28 U.S.C. § 1332(d)(2)(A)); *see also Leflar*, 57 F.4th at 603 ("Special diversity-jurisdiction rules apply in class actions.").

As the Supreme Court has held: "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014). To the contrary, the Court stated that "CAFA's 'provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.'" *Id.* (quoting S. Rep. No. 109-14, pg. 43 (2005)).

### 2. *A plaintiff can plead himself into or out of federal court under CAFA.*

There is no dispute between the parties that CAFA's threshold statutory requirements for jurisdiction are met here, save for minimal diversity. (R. Doc. 13, at 28 n.21.) And whether or not minimal diversity exists under the statute in turn depends upon how Doe chose to define his putative class, as a named plaintiff to a putative class action can plead himself either into or out of federal court. *See, e.g.*, *In re Sprint Nextel Corp.*, 593 F.3d 669, 676 (7th Cir. 2010) (holding that "plaintiffs are free to 'circumscribe their class definitions' so that they can fit within one of those exceptions and avoid federal jurisdiction") (quoting *Johnson v. Advance Am.*, 549 F.3d 932, 937 (4th Cir. 2008)).

Typically, this is done by defining a class to include only the current citizens of a particular state. *See Hood v. Glister-Mary Lee Corp.*, 785 F.3d 263, 266 (8th Cir. 2015) ("The Seventh Circuit notes two ways plaintiffs can meet their burden: (1) affidavit evidence or statistically significant surveys showing two-thirds of the class members are local citizens, or (2) redefine the class as only local citizens"); *Hargett*, 785 F.3d at 966 (same).

Doe attempted to take that route here, but with a twist: Doe did not want to limit his class temporally. (App. 61-62; R. Doc. 1-1, at 37-38 ¶ 150.) To the contrary, rather than simply define his putative class to include only "current Missouri citizens," determined as of the time of removal, *see* 28 U.S.C. § 1332(d)(7), Doe

instead added the following broad language to the beginning of his putative class: "During the fullest period allowed by law."

In full, Doe's putative class is defined as follows:

> **The SSM Health Class:** During the fullest period allowed by law, all Missouri citizens who are, or were, patients of SSM Health Care Corporation, or any of its affiliates and who exchanged communications at Defendant's websites, including www.ssmhealth.com and any other SSM Health Care Corporation affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

(App. 61-62; R. Doc. 1-1, at 37-38, ¶ 150 (emphasis in original).)

*3. The district court erred in interpreting Doe's putative class definition to include only "current" Missouri citizens.*

The district court nonetheless interpreted this language to mean that Doe still only sought to represent a putative class of "current" Missouri citizens. (App. 417-19; R. Doc. 28, at 16-18.) As the district court held: "The ordinary meaning of 'all Missouri citizens' excludes all non-Missouri citizens, including all former Missouri citizens." (App. 417; R. Doc. 28, at 16.)

Yet, this is not always the case. In *Robinson v. Shell Oil Company*, 519 U.S. 337 (1997), for example, the Supreme Court interpreted the term "employees," as used in Title VII of the Civil Rights Act, to include "former employees." *Id.* at 341. The Court noted that, "[a]t first blush, the term 'employees' in § 704(a) would seem to refer to those having an existing employment with the employer in question." *Id.*

“This initial impression, however, does not withstand scrutiny in the context of § 704(a).” *Id.* “First, there is no temporal qualifier in the statute such as would make plain that § 704(a) protects only persons still employed at the time of the retaliation.” *Id.* “That the statute could have expressly included ‘former employees’ does not aid our inquiry.” *Id.* “Congress also could have used the phrase ‘current employees.’” *Id.*

The Court thus concluded: “Finding that the term ‘employees’ in § 704(a) is ambiguous, we are left to resolve that ambiguity.” *Id.* at 345. And, based on the “broader context” in which the term “employees” was used, the Court held that it should be interpreted to include former employees. *Id.* “As noted above, several sections of the statute plainly contemplate that former employees will make use of the remedial mechanisms of Title VII.” *Id.*

This holding in *Robinson* is consistent with the “fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.” *United States v. Jespen*, 944 F.3d 1019, 1021-22 (8th Cir. 2019) (quotation omitted); *see also, e.g., King v. St. Vincent’s Hosp.*, 502 U.S. 215, 221 (1991) (holding “[w]ords are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used”) (quoting

*NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.)); *Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 25 (1988) (same; "But the meaning of words depends on their context.").

#### 4. *When read in context the "during the fullest period allowed by law" should modify the phrase "all Missouri citizens."*

These basic interpretative principles apply to Doe's putative class definition here. *See, e.g.*, *Jeff D. v. Andrus*, 899 F.2d 753, 759, 761-62 (9th Cir. 1989) (conducting *de novo* review of district court's analysis of settlement class definition because "[t]he district court construes the language of a class definition in much the same way that it might construe the language of a contract or a statute").

Reading the phrase "all Missouri citizens" in the broader context of Doe's putative class definition shows the district court erred in adding the word "current" to Doe's putative class. The purpose of the phrase "during the fullest period allowed by law" is clear: to set a durational period for the putative class. (App. 61-62; R. Doc. 1-1, at 37-38, ¶ 150.) Rather than set forth a defined limit, for example, "***from April 1, 2018, through May 1, 2019***," Doe instead sought the broadest potential duration for his putative class, whatever that might ultimately turn out to be: "the fullest period allowed by law."

Moreover, Doe's putative class is defined by *citizenship*: the putative class consists of "all Missouri *citizens*." (App. 61-62; R. Doc. 1-1, at 37-38, ¶ 150.) In this sense, the durational phrase and the phrase that immediately follows it—all Missouri

citizens—are linked together by more than mere proximity alone: the class applies during the fullest period allowed by law, and the term that defines who is and who is not a member of the class is the term "citizen."

The natural reading of this class definition, supported by the rules of grammar, is the durational period modifies the term "citizens," to include *any* citizen, whether current or former, at least so long as they were a citizen "during the fullest period allowed by law." *See, e.g.*, *Travelers Indem. Co. v. Mitchell*, 925 F.3d 236, 243 (5th Cir. 2019) (relying on the "nearest reasonable referent" canon to resolve ambiguity over what the phrase "during the policy period" modified; "When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent.") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* 152 (2012)).

*5. The Court should read any ambiguity against Doe, as the drafter of the putative class definition provision.*

Doe did not undertake any of this textual analysis in his briefing below. To the contrary, Doe argued that the class definition was unambiguous as to current Missouri citizens, because under CAFA citizenship is determined as of the time of removal. (R. Doc. 13, at 27-30.)

SSM Health does not disagree with this general proposition. *See also, e.g.*, *Hargis v. Access Cap. Funding, LLC*, 674 F.3d 783, 789 (8th Cir. 2012) ("It is axiomatic that the court's jurisdiction is measured either at the time the action is

commenced or, more pertinent to this case, at the time of removal.") (quotation omitted). In this case, however, Doe's argument on this point only begs the threshold question: Who are the individuals that comprise the class and thus also whose citizenship is supposed to be determined as of the time of removal?

On this point, the district court thus undertook to do Doe's work for him. (*See* App. 416; R. Doc. 28, at 15 (noting "Doe does not squarely respond to" SSM Health's reasonable referent argument, but nonetheless considering and rejecting the argument); App. 418; R. Doc. 28, at 17 (same for contextual interpretation of Doe's class definition; "Doe does not respond to this argument.").)

This was contrary to the general principle that "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. ----, 140 S. Ct. 1575, 1579 (2020); *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("in both civil and criminal cases, in the first instance and on appeal, we rely on the parties to frame the issues for decision and assign to the courts the role of neutral arbiter of matters the parties present").

In any event, the arguments the district court raised for Doe do not have merit. SSM Health did not ask the district court to "reconstruct the class definition" (App. 416; R. Doc. 28, at 15), but rather to interpret it. The district court reconstructed the class definition itself, by adding the word "current" before "Missouri citizens." (App. 418-19; R. Doc. 28, at 17-18.) *But cf. Anderson, trustee of the Diane L.*

*Anderson Revocable Trust v. Davis Wright Tremaine LLP*, 2021 WL 7184127, at *4-5 (D. Or. July 14, 2021) (magistrate), *aff'd* 2022 WL 562024, at *1 (D. Or. Feb. 23, 2022) (denying motion to remand under CAFA; "Reading the Class definition on its face, the identified Class includes Oregon citizens who were sold securities, regardless of whether those individuals are current Oregon citizens.").

The district court relied on the fact that in another paragraph of his petition Doe alleged that he was bringing the action "[o]n behalf of himself and all similarly situated citizens in the State of Missouri." (App. 416; R. Doc. 28, at 16.) This stray statement in Doe's 78-page, 325-paragraph petition does not purport to limit Doe's putative class definition in any way. And, more closely to the context in which the class definition appears, Doe's allegations immediately preceding the definition are all backward-looking, which is consistent with the class definition itself. (*See, e.g.*, App. 60; R. Doc. 1-1, at 36, ¶ 142 (alleging that "Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by the Meta Pixel.").)

Ultimately, the district court's analysis against removal shows the more basic problem: Doe's putative class definition is ambiguous. These ambiguities should be interpreted against Doe, as the drafter of the provision, not against SSM Health. *See, e.g.*, 11 Williston on Contracts § 32:12 (4th ed.) (*Contra proferentem*; "Since the language is presumptively within the control of the party drafting the agreement, it

is a generally accepted principle that any ambiguity in that language will be interpreted against the drafter.”); *Johnson Controls, Inc. v. City of Cedar Rapids, Iowa*, 713 F.2d 370, 375 (8th Cir. 1983) (“If any ambiguity has been created by the incorporation of both these clauses in the contract, that ambiguity must be resolved against the drafter of the contract, which in this case is the City.”).

As this Court held in reversing a remand order in *Hargett*: “The district court’s requirement that Hargett ‘clarify’ her class definition before remand suggests that it not only relied on guesswork, but also resolved doubt in her favor.” 854 F.3d at 966. “This was error.” *Id.*; *see also Leflar*, 57 F.4th at 604 (vacating remand order; “Missing here, in other words, was a level playing field.”).

*6. The home state and local controversy exceptions to CAFA jurisdiction do not apply.*

Doe also raised the “home-state” and “local-controversy” provisions as potential exceptions to CAFA jurisdiction below. (R. Doc. 13, at 29-30; *see also* 28 U.S.C. § 1332(d)(4)(A), (B).) As a general matter, “[t]he language and structure of CAFA indicate that Congress contemplated broad federal court jurisdiction with only narrow exceptions.” *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 822 (8th Cir. 2010) (quoting *Evans v. Walter Indus.*, 449 F.3d 1159, 1164 (11th Cir. 2006)). “Once CAFA’s initial jurisdictional requirements have been established by the party seeking removal,” “the burden shifts to the party seeking remand to establish that one of CAFA’s express jurisdictional exceptions applies.” *Id.*

As this Court has held, "[a] removing defendant can establish federal jurisdiction with specific factual allegations combined with reasonable deductions, reasonable inferences, or other reasonable extrapolations." *Brunts v. Walmart, Inc.*, 68 F.4th 1091, 1094 (8th Cir. 2023) (quotation and ellipsis omitted); *see also, e.g.*, *Raskas v. Johnson & Johnson*, 719 F.3d 884, 888 (8th Cir. 2013) ("The substantive jurisdictional requirements of removal do not limit the types of evidence that may be used to satisfy the preponderance of the evidence standard. Defendants may introduce their own affidavits, declarations, or other documentation—provided of course that removal is procedurally proper.").

Doe did not dispute, as a matter of fact, that SSM Health met its threshold burden to establish that minimal diversity exists in this case, at least assuming that the Court should interpret Doe's putative class definition to include former Missouri citizens. (R. Doc. 20, at 2-3.) Nor could he.

Doe's petition shows the interstate character of this putative class action. Two of the SSM Health entities listed as "Defendant" in the petition's opening paragraph are located and operate in Illinois. (App. 25, 27-28; R. Doc. 1-1, at 1, 3-4, ¶ 7; R. Doc. 1, at 12, ¶ 44 (allegations regarding SSM Health St. Mary's-Centralia and SSM Health Good Samaritan Hospital-Mt. Vernon).) SSM Health is headquartered in St. Louis, which looks over the Mississippi River to the State of Illinois on the other side. Not surprisingly, there is significant migration between the two states. (App.

106-119, R. Doc. 19-1, at 2-14 (showing state-to-state migration flows).) And, finally, SSM Health's website is available to anyone in the world at large, https://ssmhealth.com/, whether current or former Missouri citizen or not, SSM Health patient or not, or simply a high school student writing a report.

For all of these reasons, CAFA jurisdiction is appropriate in this case. As this Court has held: "CAFA 'is intended to expand substantially federal court jurisdiction over class actions. Its provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.'" *Westerfeld*, 621 F.3d at 822 (quoting S. Rep. No. 109-14, at 43 (2005)). This case belongs in federal court under 28 U.S.C. § 1332(d), and the district court's remand order should be reversed for this reason alone.

### C. FEDERAL OFFICER REMOVAL RESTS ON THE BASIC INTEREST OF THE ENFORCEMENT OF FEDERAL LAW THROUGH FEDERAL OFFICIALS.

SSM Health also removed this case to federal court under 28 U.S.C. § 1442(a)(1). (App. 7; R. Doc. 1, at 1.) The federal officer removal statute has a lineage going back more than 200 years. *See Tennessee v. Davis*, 100 U.S. 257, 267 (1879); *Willingham v. Morgan*, 395 U.S. 402, 405 (1969) ("The federal officer removal statute has had a long history."); *Mesa v. California*, 489 U.S. 121, 125–26 (1989); *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147–48 (2007) (same).

Throughout the entire course of this period, Congress has consistently broadened the scope of permissible federal jurisdiction under the statute, including

most recently through the Removal Clarification Act of 2011. *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 291–92 (5th Cir. 2020) (en banc) (analyzing statutory amendment; holding that "[b]y the Removal Clarification Act, Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office") (emphasis in original).

As currently constituted, the text of 28 U.S.C. § 1442(a)(1) provides as follows:

> A *civil action* or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: (1) The United States or any agency thereof (*or any person acting under that officer*) of the United States or any agency thereof, in an official or individual capacity, *for or relating to any act under color of such office*. . . .

28 U.S.C. § 1442(a)(1) (emphasis added).

### D. SSM Acted Under Color of Federal Law in Making a Patient Portal Available Online under *Watson*.

To remove under the statute, "a private defendant must establish that (1) it acted under the direction of a federal officer, (2) there is a connection between the claims and the official authority, (3) the defendant has a colorable federal defense to the plaintiffs' claims, and (4) the defendant is a 'person,' within the meaning of the statute." *Minnesota by Ellison v. Am. Petrol. Inst.*, 63 F.4th 703, 714 (8th Cir. 2023); *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021) (same).

Doe did not dispute below that SSM Health is a person under the statute. (R. Doc. 13, at 11-27.) The other three factors, however, are each disputed.

### *1. The Supreme Court interprets the "acting under" requirement for federal officer removal in Watson.*

The district court rested the court's remand order primarily on the holding that SSM Health failed to meet the statute's "acting under" requirement. (App. 414; R. Doc. 28, at 13.) The Supreme Court interpreted this requirement at length in the *Watson* case. The plaintiffs there "filed a civil lawsuit in Arkansas state court claiming that the Philip Morris Companies . . . violated state laws prohibiting unfair and deceptive business practices." 551 U.S. at 145. In particular, the complaint referred to "the design and performance of Philip Morris cigarettes that are tested in accordance with the Cambridge Filter Method, a method that the tobacco industry uses to measure tar and nicotine levels in cigarettes." *Id.*

Philip Morris removed the case to federal court, arguing that "the FTC, after initially testing cigarettes for tar and nicotine, '*delegated authority*' for that task to an industry-financed testing laboratory in 1987." *Id.* at 154 (emphasis in original). Philip Morris argued that "ever since this initial 'delegation' the FTC has extensively supervised and closely monitored the manner in which the laboratory tests cigarettes." *Id.* Based on these circumstances, Philip Morris argued it was "'acting under' officers of the FTC when it conducts cigarette testing." *Id.*

The Supreme Court disagreed. The Court held that "[i]n this context," "the word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.'" *Id.* (quoting 18 Oxford English Dictionary 948 (2d ed. 1989)). That relationship "typically involves 'subjection, guidance, or control.'" *Id.* (quoting Webster's New Int'l Dictionary 2765 (2d ed. 1953)). "In addition," the Court continued, "precedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal supervisor." *Id.* at 152 (emphasis in original).

The basic limitation the Court placed on this holding was that mere compliance with the law, even a detailed regulatory regime, was not sufficient to support federal office removal: "the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law." *Id.* (emphasis in original). "A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a 'federal official.'" *Id.* at 153. "And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.*

Applying this analysis to the facts in *Watson*, the Court held that "Philip Morris' argument nonetheless contains a fatal flaw—a flaw of omission." *Id.* at 156.

"Although Philip Morris uses the word 'delegation' or variations many times throughout its brief, we have found no evidence of any delegation of legal authority from the FTC to the industry association to undertake testing on the Government's behalf." *Id.* "Nor is there evidence of any contract, *any payment*, any employer/employee relationship, or any principal/agent arrangement." *Id.* (emphasis added).

"We are left," the Court concluded, "with the FTC's detailed rules about advertising, specifications for testing, requirements about reporting results, and the like. This sounds to us like regulation, not delegation." *Id.* at 157.

*2. The acting under requirement is met in this case based on Doe's patient portal allegations.*

In this case, applying *Watson*, the acting under requirement is met based on the allegations and claims in Doe's petition relating to the SSM Health MyChart patient portal. Specifically, the factual record shows as follows:

1. Through Executive Order and then by statute President Bush and Congress created the National Coordinator for Health Information Technology position. (*See Executive Order # 13335*, at pg. 1, § 1 (*Establishment*); 42 U.S.C. § 300jj-11, *Office of the National Coordinator for Health Information Technology*.)

2. Through Executive Order and then by statute President Bush and Congress tasked the National Coordinator with one overarching federal

responsibility: to collaborate with health care providers to improve the nation's use of health information technology. (*Executive Order # 13335*, at pg. 2, § 3 (*Responsibilities of the National Health Information Technology Coordinator*); 42 U.S.C. § 300jj-11(c) ("**Duties of the National Coordinator**") (emphasis in original), *including*: (c)(3)(B) ("**Collaboration**") (emphasis in original).)

3. From the outset, one important piece of this federal health information technology mission was the ability for individuals to be able to access their health records online. (*E.g.*, TOMMY G. THOMPSON & DAVID J. BRAILER, MD, PHD, *The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care*, at pg. e (July 21, 2004) (discussing a "Medicare beneficiary portal"); *id.* at Attachment 1, Off. of Personnel Mang't Rep. at 6-7 (July 2004) (discussing "MyAnthem," which "provides an easy way to help members gain more control over their health care benefits through secure access that's available at any time and from any place"); *id.* at Attachment 2, Veteran Affairs Rep., at 18 (July 15, 2004) (discussing "My HealtheVet – The Personal Health Record").

4. As the National Coordinator explained in his first official strategic plan: "The single biggest lever to individual empowerment is access to data."

(App. 156; R. Doc. 19-2, *Federal Health Information Technology Strategic Plan 2011–2015*, at pg. 36.) Thus also: "The Federal Health IT Taskforce has recognized individual access to data as a primary objective." (*Id.* at pg. 40); *see also* App. 270; R. Doc. 19-4, *2015-2020 Federal Health IT Strategic Plan*, at pg. 8 ("Federal actions will help establish an environment where secure universal health information exchange and use are expected and accepted so that everyone benefits from simple, timely, equitable, efficient, and appropriate electronic access to and sharing of health information.").)

5. To accomplish this goal, Congress earmarked billions of dollars for healthcare providers who participated in the Meaningful Use Program through the federal Medicare and Medicaid programs. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (Cong. Res. Serv. Apr. 27, 2009) (discussing financial incentives; "Beginning in 2011, the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and use certified EHRs. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not

using certified EHRs."); *see also id.* at Table 2 (synopsizing "Medicare and Medicaid Payments").

6. SSM Health was on the search; the healthcare provider assisted the federal government in accomplishing this federal health information technology mission by making a patient portal available to SSM Health's patients online: https://www.ssmhealth.com/mychart. In exchange for doing so, SSM Health received payments directly from the federal government for providing this online access. (App. 401; R. Doc. 19-7, at 2, ¶ 5.) These payments were contingent on SSM Health making annual reports to the federal government regarding the patient portal and how it was being used. (*Id.*, ¶ 4.) Moreover, SSM Health now avoids federal Medicare and Medicaid reductions in fee-for-services reimbursements for providing this online access. (*Id.*).

And now, finally, to close the loop, through his claims in this action, Doe seeks to hold SSM Health liable for providing that online access, for alleged privacy violations that occur under Missouri state law *precisely when an individual clicks on patient portal link*. (App. 71; R. Doc. 19-1, at 47, ¶ 185(i), (j) (alleging "Defendant aided in the interception of 'contents' in at least the following forms: . . . i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, *including Log-Ins*, Registrations, Requests for

Appointments, Search, and other buttons," as well as "[t]he precise dates and times *when patients click to Log-In* on Defendant's websites") (emphasis added).)

This basic factual record meets all the requirements for the "acting under" requirement for federal officer removal. This was not a mere compliance with the law, as in *Watson*. This was a paid partnership with the federal government to produce a result that the federal government desired and could not make available without the assistance of the private sector—the health care providers who actually provide the treatment to patients and thus also hold the information that the federal government wanted to make available to patients and their caretakers online in the first instance.

As the President's Information Technology Advisory Committee initially stated in 2004: "Presidential leadership is essential to achieving the full potential of health information technology because multiple Federal departments and agencies must be coordinated in concert with the private sector, which delivers most of the care in our 1.6 trillion dollar health care system." (App. 217; R. Doc. 19-3, *Revolutionizing Health Care Through Information Technology*, at pg. 4; App. 266; R. Doc. 19-4, *Federal Health IT Strategic Plan 2015–2020* at pg. 4 ("this is a shared undertaking. Efforts of state, territorial, local, and tribal governments, and private stakeholders are vital to ensure that health information is available when and where it matters most to improve and protect people's health and well-being.").)

### E. The District Court's Acting Under Analysis for the Facts Alleged in Doe's Petition Is Flawed.

The first two federal judges to look at this factual record held that this was the type of character of federal assistance required to invoke the broad language of 28 U.S.C. § 1442(a)(1). *Doe v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul.31, 2020), *interlocutory appeal denied*, 2020WL 5742685 (W.D. Pa. Sept. 25, 2020) ("UPMC has shown that by its participation in the Meaningful Use Program, it was 'acting under' DHHS when it engaged in the conduct at issue in the Complaint."); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020), *interlocutory appeal denied*, 2020 WL 7705713 (N.D. Ohio Dec. 14, 2020) (same; "Because Defendant's participation assisted the federal government in achieving that goal, Defendant has satisfied the 'acting under' prong").

The Eastern District of Missouri became the first court to go the other way, in the *BJC* case that is on appeal before this Court. (*John Doe I, et al. v. BJC Healthcare System*, Case No. 23-1107 (argued September 20, 2023).) Every district court to analyze the issue facing this deluge of website privacy healthcare litigation has since agreed with the court's decision in *BJC*, and rejected removal to federal court under the reasoning from *UPMC* and *ProMedica*. (App. 414; R. Doc. 28, at 13.)

There is a flaw running through these decisions: they dismiss the Meaningful Use Program as being a run-of-the-mill "voluntary incentive program." (App. 408; R. Doc. 28, at 7 (quoting *BJC Health System*, 2023 WL 369427, at *4).)

This assessment pays short shrift to the federal interests at stake. "The U.S. Department of Health and Human Services has a critical responsibility to advance the connectivity of electronic health information and interoperability of health information technology (health IT)." *See, e.g.*, OFF. OF NAT'L COORDINATOR, *A 10-Year Vision to Achieve an Interoperable Health IT Infrastructure*, at pg. 1 (Apr. 2014). "This is consistent with its mission to protect the health of all Americans to provide essential human services, especially for those who are least able to help themselves." (*Id.*) Moreover, the federal government spent $1.2 *trillion* on health care in 2019 alone. *See* The Tax Policy Center's Briefing Book, at pgs. 346-47 (updated May 2020), available at https://www.taxpolicycenter.org/briefing-book/how-much-does-federal-government-spend- health-care. Health IT also "will support more efficient and effective systems." *See A 10-Year Vision*, at pg. 1.

Thus, there is substantial incentive for the federal government to come up with its own system for making health records available online, to the extent that the federal government believed it would improve patient health and in turn reduce patient costs. In co-opting private actors—the entities that actually create and hold the information in the first instance—the government simply found a different way to do the same job. *See* Cong. Res. Serv., *The HITECH Act*, at pg. 2 ("Over the 2009-2019 period, [the Congressional Budget Office] estimates that the HITECH Act will save the Medicare and Medicaid programs a total of $12.5 billion.").)

As this Court has held: "Very generally, then, the federal officer removal statute was designed to avert various forms of state court prejudice against federal officers or those private persons acting as an assistant to a federal official in helping that official carry out federal law." *Jacks v. Meridian Resource Co., LLC*, 701 F.3d 1224, 1231 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021).

In *Jacks*, the Court allowed removal of a Missouri state law anti-subrogation putative class action based on a plan administrator's pursuit of settlement proceeds as against a federal health benefits plan participant under *Watson*. *Id.* at 1228. The Court explained that, "[i]n *Watson*, the Court looked to the statute's language, context, history, and purposes to inform the analysis regarding just how broadly the federal officer removal statute should be applied." *Id.* at 1231.

Analyzing the facts at issue through the lens of this history, the Court held that removal was appropriate because, "[a]s a private contractor, BCBS-KC is helping the government to produce an item that it needs—the basic governmental task of providing health benefits for its employees." *Id.* at 1234. "Likewise, there *is* evidence of contracts, payments, and other such relational evidence sufficient to support removal here." *Id.* at 1233.

This same analysis applies from *Jacks* applies to this case here. (App. 401; R. Doc. 19-7, at 2, *Jennifer Ezzell Decl.* ¶¶ 4-5 (describing financial incentives and the

financial penalties SSM Health has received and avoided for participating in the Meaningful Use Program); *see also Stephenson v. Nassif*, 160 F. Supp. 3d 884, 888-89 (E.D. Va. 2015) (allowing removal of former employee's state law retaliation claims for filing confidential information red flag report; "it is pellucid that the broad language of § 1442(a)(1) must be applied in a manner that effectuates the central congressional policy of securing a federal forum for persons who assist the federal government in a manner that risks the imposition of state law liability").)

### F. DOE'S MISSOURI STATE LAW CLAIMS ARE "FOR" OR "RELATED TO" SSM HEALTH'S ACTIONS TAKEN UNDER COLOR OF FEDERAL LAW.

The third requirement for federal officer removal is a causal connection—the plaintiff's allegations and claims must be "for or relating to" the defendant's actions taken under color of federal law. *See* 28 U.S.C. § 1442(a)(1). "The hurdle erected by this requirement is quite low." *Jacks*, 701 F.3d at 1230 n.3 (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)); *see also DeFiore v. SOC LLC*, --- F.4th ----, 2023 WL 7009600, at *7 (9th Cir. Oct. 25, 2023) (same; "'It is enough that the defendant's acts or his presence at the place in performance of his official duty constitute the basis, though mistaken or false,' of a plaintiff's claims.") (quoting *Maryland v. Soper*, 270 U.S. 9, 33 (1926)).

Moreover, as set forth above, this causal connection hurdle has been further reduced by Congress, through the Removal Clarification Act, to encompass acts that are either "for" *or* "relating to" the actions taken under color of federal law. As the

*en banc* Fifth Circuit held in *Latiolais*: "By the Removal Clarification Act, Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." 951 F.3d at 291–92 (emphasis in original); *see also Minnesota by Ellison*, 63 F.4th at 714-15 (same; "Though we have continued to describe the standard in terms of 'causal connection,' the causal connection required by § 1442(a)(1) is for the activity in question to relate to a federal office.").

This causal connection requirement is met here, based on Doe's allegations of alleged privacy violations for the SSM Health MyChart patient portal link. As set forth above, Doe's liability theory is directly related to this link, including with respect to the alleged "contents" of his communications with SSM Health for his Missouri Wiretap Act claim. (App. 71; R. Doc. 1-1, at 47, ¶ 185(i), (j) (contents include "(i) The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons; (j) The precise dates and times when patients click to Log-In on Defendant's website(s)").)

At a more basic level, Doe's causal connection argument fails because of the nature of his claims. Indisputably, what we do on the Internet is not private; *some* third party is going to know what Doe's web browser searched for on SSM Health's website, including when he clicked on the patient portal link, merely for the internet

to function, irrespective of any action SSM Health does or does not take. *See, e.g.*, FED. TRADE COMM'N, *A Look at What ISPs Know About You: Examining the Privacy Practices of Six Major Internet Service Providers*, at pg. i (Oct. 21, 2021) ("As the direct gateways to this essential and ubiquitous tool, internet service providers ('ISPs') can monitor and record their customers' every online move, giving them the ability to surveil and amass large amounts of information on them as they go about their daily lives."); DOUGLAS J. LIETH, *Web Browser Privacy: What Do Browsers Say When They Phone Home?*, at pg. 1 (IEEE*Access*, Mar. 10, 2021) ("Hence, while users are browsing the web Chrome shares data with Google services, Firefox with Mozilla servers etc. as part of a normal internal browser operation.").

Through his petition in this case, Doe wants the Missouri state judiciary to pick and choose which one of these alleged third-party disclosures are permissible, and which ones are not. This includes, in particular, which alleged third-party disclosures are or are not permissible at the moment a SSM Health patient or their caretaker clicks on the SSM Health MyChart patient portal link.

There is a fair argument to be made that these are legislative lines that should be drawn, not judicial ones. That being said, to the extent that any judiciary should be drawing these lines, Congress has provided through 28 U.S.C. § 1442(a)(1) that it should be a federal one.

As the Supreme Court held in *Willingham*: "If the question raised is whether they were engaged in some kind of 'frolic of their own' in relation to respondent, then they should have the opportunity to present their own version of the facts to a federal, not a state, court. This is exactly what the removal statute was designed to accomplish." 395 U.S. at 409; *see also Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020) ("whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer").

### G. SSM HEALTH HAS COLORABLE FEDERAL DEFENSES TO DOE'S MISSOURI STATE LAW CLAIMS.

The final requirement for federal officer removal is that the defendant have a "colorable" federal defense. As with the causal connection requirement, the standard here is low; "[f]or a defense to be considered colorable, it need only be plausible; § 1442(a)(1) does not require a court to hold that a defense will be successful before removal is appropriate." *Graves*, 17 F.4th at 771 (quoting *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001)).

Moreover, when an alleged, and disputed, federal duty forms the basis for plaintiff's state law claims, then removal under 28 U.S.C. 1442(a)(1) is appropriate. *Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999) (holding that "[u]nder the federal officer removal statute, suits against federal officers may be removed despite

the nonfederal cast of the complaint; the federal-question element is met if the defense depends upon federal law").

As the Supreme Court held in *Mesa v. California*, 489 U.S. 121 (1989): "To assert that a federal statute does *not* impose certain obligations whose alleged existence forms the basis of a civil suit is to rely on the statute in just the same way as asserting that the statute *does* impose other obligations that may shield the federal officer against civil suits." 489 U.S. at 130 (emphasis in original). "Both are equally defensive and equally based in federal law." *Id*.

*1. Doe's allegations regarding alleged HIPAA violations provide for federal jurisdiction on their own.*

These holdings from *Mesa* and *Acker* apply here. Doe alleges the information SSM Health allegedly transmitted to Facebook through the Meta Pixel is protected health information under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), even though Doe does not allege that SSM Health had the Meta Pixel within the patient portal. (App. 52; R. Doc. 1-1, at 28, ¶ 105 (citing 45 C.F.R. § 164.514).) Doe further alleges SSM Health violated the HIPAA regulations by disclosing his protected health information to Facebook for marketing purposes without his expressed consent. (App. 51, 66; R. Doc. 1-1, at 27, 42, ¶¶ 97, 169 (citing 45 C.F.R. § 164.508).) Moreover, Doe has incorporated these allegations by reference into every one of his alleged claims. (App. 66, 73, 76, 78, 86, 88, 91, 95, 99; R. Doc. 1-1, at 42, 49, 52, 54, 62, 64, 67, 71, 75.)

In addition, for his Missouri Wiretap Act claim, Doe expressly alleges that the "tortious or criminal" exception to the one-party consent rule should apply because of SSM Health's alleged HIPAA violations. On this point, Doe pleads that "the disclosure of Plaintiff's and Class Members' Personal Health Information to third parties including Facebook without consent or proper authorization is both a criminal and tortious act that violates multiple laws," including, in particular, "45 CFR § 164.508(a)(1)." (App. 66; R. Doc. 1-1, at 42, ¶ 169.)

SSM Health disputes Doe's allegations regarding alleged HIPAA violations through the transmission of internet metadata. As the Ninth Circuit held in a case challenging similar alleged website privacy violations stemming from the use of the Facebook "Like" button: "The district court also properly rejected Plaintiffs' claims that the collected data is subject to more stringent disclosure requirements under the Health Insurance Portability and Accountability Act of 1996 ('HIPAA') (codified as amended in scattered sections of 42 U.S.C.) and California Civil Code section 1798.91 (2014)." *Smith v. Facebook*, 745 F. App'x 8, 9 (9th Cir. 2018).

The court concluded: "Information available on the publicly accessible website stands in stark contrast to the personally identifiable patient records and medical histories protected by these statutes—information that unequivocally provides a window into an individual's personal medical history." *Id.*

Thus also: "Put simply, the connection between a person's browsing history and his or her own state of health is too tenuous to support Plaintiffs' contention that the disclosure requirements of HIPAA or section 1798.91 apply." *Id.*

Whoever is ultimately proved right or wrong on this point, this federal defense to Doe's Missouri state law claims—that no such duties exist under federal law, and here HIPAA in particular—provides the federal courts with jurisdiction over the state law claims under 28 U.S.C. § 1442(a)(1). *See Todd*, 245 F.3d at 693 (removal proper where the parties disputed the scope of the Freedom of Information Act; "Because we believe that § 552 at the very least plausibly shields the United States from any obligation to comply with Mr. Todd's request for its files, we find that removal was proper."); *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 473-474 (3d Cir. 2015) (same with respect to Civil Justice Act; "We find this to be a federal defense in that it requires interpretation of federal statutes, the CJA and § 3599, as well as the *Guide*, which the Judicial Conference promulgated to effectuate these requirements").

*2. SSM Health also has federal preemption and First Amendment defenses to Doe's Missouri state law claims.*

The parties' dispute over HIPAA on its own meets the colorable federal defense requirement. Here, however, there are also two additional federal defenses at issue. *First*, Doe's state law claims related to alleged privacy violations that occur when an individual clicks on the SSM Health MyChart patient portal link raise

federal preemption concerns. *See Murphy v. Nat'l Coll. Ath. Ass'n*, 584 U.S. ---, 138 S. Ct. 1461, 1480 (2018) (analyzing preemption doctrines).

As the Supreme Court explained in *Murphy*: "Our cases have identified three different types of preemption—'conflict,' 'express,' and 'field,' *see English v. General Elec. Co.*, 496 U.S. 72, 78–79 (1990)—but all of them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.*; *see also Boggs v. Boggs*, 520 U.S. 833, 844 (1997) (holding conflict pre-emption occurs where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (quotation omitted).

There is a reason the program was initially referred to as the Meaningful Use program—health care providers were reimbursed more under Medicare and Medicaid based on how much patients actually used their patient portals. 42 C.F.R. § 495.20(l)(8)(ii) (requiring report as to whether "[m]ore than 5 percent of all unique patients . . . view, download or transmit to a third party their information during the EHR reporting period"). In the National Coordinator's Patient Engagement Playbook—which was self-described as "an important tool for *our mission* to help clinicians and their patients adopt and adapt to patient portals and patient-generated health data" (App. 322; R. Doc. 19-6, *Patient engagement playbook*, at 5 (emphasis

added))—the National Coordinator told health care providers to "[u]se Playbook language *on your website or Facebook page* to let patients know how they can use the patient portal to participate in their care" (*id.* (emphasis added).)

The Playbook told health care providers to "Market and educate effectively" (App. 332; R. Doc. 19-6, at 16); to "leverage every educational opportunity" (*id.*); to "Take advantage of every touchpoint" (App. 334; R. Doc. 19-6, at 18); and to "[t]ake every opportunity to promote patient portal enrollment" (*id.*). Indeed, the Center for Medicare and Medicaid Services used these very same types of marketing techniques on CMS's own website, including with respect to the Medicare beneficiary portal in particular. (App. 12; R. Doc. 1, at 6, ¶ 21; R. Doc. 19, at 16.)

Doe's claims SSM Health should be precluded from using website analytical tools to grow awareness regarding SSM Health's patient services and thus also the potential availability of the SSM Health MyChart patient portal itself raise substantial conflict preemption concerns, particularly given the federal government engaged in these same practices. *See UPMC*, 2020 WL 4381675, at *7; *ProMedica*, 2020 WL 7705627, at *3 (both finding federal preemption defenses colorable).

*Second*, the First Amendment will play a material role in this case. As the Supreme Court has held: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the

Internet' in general, and social media in particular." *Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017) (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997)).

These speech interests are apparent from the petition. Doe alleges Facebook has "evolved into one of the largest advertising companies in the world" (App. 34; R. Doc. 1-1, at 10, ¶ 44); "can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels" (*id.*); "has more than 2.9 billion users," and "provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network" (App. 35; R. Doc. 1-1, at 11, ¶ 45); that "the Meta Pixel is an analytics tools that allows businesses to measure the effectiveness of their advertising by understanding the actions people take on their websites" (App. 37; R. Doc. 1-1, at 13, ¶ 55); "is wildly popular and embedded on millions of websites" (App. 42; R. Doc. 1-1, at 18, ¶ 75); and that "[a] third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic" (App. 41; R. Doc. 1-1, at 17, ¶ 72).

Under Doe's view, every other company in the country can transfer internet metadata to Facebook in order to analyze the effectiveness of their internet speech, but healthcare providers like SSM Health cannot, because to do so would allegedly violate Missouri state law. (App. 66-101; R. Doc. 1-1, at 42-77, ¶¶ 164-325.)

This position raises substantial First Amendment concerns. As the Supreme Court has also held: "The creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *see also U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224, 1232 (10th Cir. 1999) (holding the First Amendment protects the right to use information to engage in targeted advertising; "a restriction on speech tailored to a particular audience, 'targeted speech,' cannot be cured simply by the fact that a speaker can speak to a larger indiscriminate audience, 'broadcast speech.'").

## CONCLUSION

"All federal courts, other than the Supreme Court, derive their jurisdiction wholly from the exercise of the authority to 'ordain and establish' inferior courts, conferred on Congress by Article III, § 1 of the Constitution." *Lockerty v. Phillips*, 319 U.S. 182, 187 (1943). "The Congressional power to ordain and establish inferior courts includes the power 'of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good.'" *Id.* (quoting *Cary v. Curtis*, 3 How. 236, 245, 11 L.Ed. 576 (1845)).

Jurisdiction is proper in federal court in this case under both 28 U.S.C. § 1332(d) and 28 U.S.C. § 1442(a)(1). The district court's remand order should therefore be reversed.

Date: November 1, 2023

Respectfully submitted,

/s/ *David Carney*

DAVID A. CARNEY
**BAKER & HOSTETLER LLP**
127 Public Square, Suite 2000
Cleveland, Ohio 44114
216.621.0200
dcarney@bakerlaw.com

PAUL G. KARLSGODT
**BAKER & HOSTETLER LLP**
1801 California Street, Suite 4400
Denver, Colorado 80202
303.861.0600
pkarlsgodt@bakerlaw.com

JOHN D. COMERFORD
ADAM J. SIMON
**DOWD BENNETT LLP**
7676 Forsyth Blvd., Suite 1900
St. Louis, Missouri 63105
314.889.7311
jcomerford@dowdbennett.com
asimon@downbennett.com

*Attorneys for Defendant-Appellant*
*SSM Health Care Corporation*

## CERTIFICATE OF COMPLIANCE

Defendant-appellant SSM hereby certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), the brief contains 11,609 words. The brief is written using Microsoft Office Word Version 2302 in 14-point Times New Roman font, a proportionally spaced typeface, which meets the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6).

November 1, 2023

/s/ *David Carney*
*One of the Attorneys for Defendant-Appellant*
*SSM Health Care Corporation*

## VIRUS CHECK CERTIFICATION

Pursuant to Circuit Rule 28(A)(h), I also hereby certify that electronic files of this Brief and accompanying Addendum have been submitted to the Clerk via the Court's CM/ECF system. The files have been scanned for viruses and are virus-free.

November 1, 2023

/s/ *David Carney*
*One of the Attorneys for Defendant-Appellant*
*SSM Health Care Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2023, a copy of the foregoing *Brief of Appellant* was served electronically on all parties. Notice of this filing will be sent to counsel for all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *David Carney*
*One of the Attorneys for Defendant-Appellant*
*SSM Health Care Corporation*